UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARY PERES,

                           Plaintiff,                **MEMORANDUM & ORDER**

     -against-                                    05 Civ. 1807 (DRH) (MLO)

OCEANSIDE UNION FREE SCHOOL
DISTRICT, HERBERT R. BROWN, in his
individual and official capacity, DORIE
C. CIULLA, in her individual and
official capacity, and RICHARD ROSCHELLE,
in his individual and official capacity,

                             Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**ERIC M. BERMAN, P.C.,**
Attorney for Plaintiff
500 West Main Street, Suite 212
Babylon, New York 11702-3035
By: Eric M. Berman, Esq.

**JAMES R. SANDNER**
Attorney for Defendant Richard Roschelle
52 Broadway, 9th Floor
New York, N.Y. 10004
By: Lena M. Ackerman, Esq.
    Pamela P. Fynes, Esq.

**CRONIN & BYCZEK LLP**
1983 Marcus Avenue, Suite C-120
Lake Success, New York 11042
By: Christopher F. Bellistri, Esq.
    Linda M. Cronin, Esq.
    Rocco G. Avallone, Esq.

**HURLEY, District Judge:**

# INTRODUCTION

Plaintiff Mary Peres ("Plaintiff") filed the present action against defendants Oceanside Union Free School District (the "District"), Herbert R. Brown ("Superintendent Brown"), Dorie C. Ciulla ("Principal Ciulla") (collectively, the "District Defendants"), and Richard Roschelle ("Roschelle") (together with the District Defendants, hereinafter referred to as "Defendants") alleging that they violated her rights under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 ("Section 1983") and that they discriminated against her in violation of the Age Discrimination in Employment Act (the "ADEA") and the New York State Human Rights Law ("NYSHRL"). Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons that follow, Defendants' motion is granted and this case is dismissed in its entirety.

# BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted. Plaintiff, who was born on December 3, 1946, has been employed by the District as a teacher of marketing and business courses at Oceanside High School since approximately 1970; she still holds this position as of today. Plaintiff's position as teacher is tenured. As a tenured teacher, Plaintiff is represented for purposes of collective bargaining by the Oceanside Federation of Teachers, Local 1631 of the American Federation of Teachers, AFL-CIO (the "Union"). At all times relevant to the Complaint, Roschelle served as Executive Vice President of the Union.

In addition to her regular teaching duties, for over twenty-eight years, Plaintiff has served as the Oceanside Advisor for the Distributive Education Clubs of

America/Association of Marketing and Management Students ("DECA") Program. (Pl.'s Dep. at 24.)

In 1994, a notice of vacancy for the position of Student Activities Coordinator or Student Projects Coordinator ("SP Coordinator") was placed in the mailbox of every teacher at Oceanside High School, including Plaintiff's. The position was also advertised on the bulletin board at the main office at the high school. The SP Coordinator is responsible for coordinating the operation of all extra-curricular activities within the High School. Plaintiff applied for, interviewed, and was ultimately appointed to the SP Coordinator position for the 1994-1995 school year. Plaintiff was 47 years old at the time of her appointment. Each consecutive year, from 1994 through 2003, the District offered Plaintiff a new contract for the SP Coordinator position, which Plaintiff accepted. Thus, Plaintiff was reappointed as SP Coordinator each year through and including the 2003-2004 school year, for which she received an additional annual stipend. According to Plaintiff, the stipend was in the amount of $7,764.00 per year. (Compl. ¶ 41.)

Each tenured teacher at Oceanside High School typically teaches five periods of instruction within his or her tenured area. Because of the added responsibilities that come along with the SP Coordinator position, however, the teacher appointed as SP Coordinator is released from full teaching duties and teaches only one class per day. This teacher still receives full salary, as well as the stipend for service as SP Coordinator.

Prior to her appointment as SP Coordinator for the 1994-1995 school year, Plaintiff taught either four to five classes in her business tenure area. During the time Plaintiff served as SP Coordinator, Plaintiff was required to teach only one class per day in order to

provide her sufficient time to devote to her duties as SP Coordinator.[1]  Plaintiff still received a full teacher's salary as well as the stipend for her service as SP Coordinator.

On June 3, 2004, Plaintiff was notified that her contract as the SP Coordinator would not be renewed for the 2004-2005 school year.  Plaintiff claims that she was removed from this position both as a direct result of her reporting financial improprieties by other District employees and based upon her age.  Her claims are discussed in more detail below.

### A.       *Plaintiff's Reporting of Financial Improprieties in her Role as DECA Advisor*

In her position as SP Coordinator, Plaintiff was responsible for signing off on the purchase of supplies for extra-curricular activities once the proper supporting documentation was provided.  In September 2001, Plaintiff discovered that her signature had been forged on numerous purchase order requisition forms in the area marked "purchase approved by," indicating that Plaintiff had approved payment to certain vendors for student activity-related expenses.  Plaintiff had not authorized her signature to be placed on the forms.

According to Plaintiff, she first reported the forgeries to several school administrators in 2001, including her immediate supervisor Ilene Klein ("Klein"), the Assistant Principal, and then Principal Gerard Cairns.  Principal Cairns spoke to Betty Dunwoody, the Student Projects Secretary, who admitted to signing Plaintiff's name on the forms.  Ms. Dunwoody was over eighty years old at the time.  Plaintiff believed the matter was resolved.

---

[1]  Plaintiff asserts that prior to assuming the SP Coordinator position, she had been relieved of one teaching period due to her assignment as DECA Adviser.

Thereafter, the alleged forgeries continued and in June 2002, Plaintiff reported the situation to Superintendent Brown. Superintendent Brown informed Plaintiff that Ms. Dunwoody was signing Plaintiff's name in order to expedite the paying of bills.

During the 2002-2003 school year, Principal Ciulla became the new principal of Oceanside High School. Plaintiff reported the matter to Principal Ciulla, who advised Plaintiff that Superintendent Brown had informed her of what had transpired the prior year and that she was going to enact a new policy regarding the review of purchase orders. A signature card policy was also instituted.

In or about April 2003, Plaintiff discovered another forgery and reported it to Principal Ciulla. According to Plaintiff, Principal Ciulla told Plaintiff that she spoke to two other individuals involved in the purchase order and they admitted it was a forgery. She also allegedly told Plaintiff not to "put her in the middle of this again, to solve it [her]self." (Pl.'s Dep. at 120.) Plaintiff made no further complaints of forgery after April 2003.

At the conclusion of the 2002-2003 school year, Ms. Dunwoody fell ill and went on sick leave. She never returned to school after her illness and passed away in 2004. In or about May 2003, while Ms. Dunwoody was out on medical leave, Plaintiff was present when the Student Activities Fund Safe was opened and over $50,000 was discovered to be inside against District policy. According to Plaintiff, this policy mandates that once cash comes into a school building, it be deposited within twenty-four hours. (Pl.'s Dep. at 134.) The money in the safe, however, had been sitting there for months. (*Id.*) Plaintiff testified that Ms. Dunwoody was the only person who could have placed the money in the safe. (*Id.* at 134-35.) After

discovering the money, the District bookkeeper came to the school and deposited the funds. (*Id.* at 136.) Plaintiff never accused Ms. Dunwoody of taking funds from the safe. (*Id.* at 130.)

Thereafter, Plaintiff was offered and accepted a contract for the SP Coordinator position for the 2003-2004 school year. The following year, on June 3, 2004, Plaintiff was notified that her contract as the SP Coordinator would not be renewed for the 2004-2005 school year, *see* discussion *infra*.

### B. The DECA Trip and Plaintiff's Resulting Disciplinary Letter

From April 30 through May 5, 2004, and in her role as DECA Advisor, Plaintiff chaperoned a school trip to Nashville, Tennessee with nineteen of her students. Plaintiff contends that both she and Klein (Plaintiff's supervisor) were jointly in charge of the trip. On May 3, 2004, DECA hosted a dance that the students were required to attend. Instead of attending the dance, three students went to a club without permission from Plaintiff or any other adult chaperone. One of the students was physically injured at the club and had to be taken to the hospital by Plaintiff. Additionally, two students who attended the dance failed to return by the 12:00 a.m. curfew.

On May 4, 2004, a National DECA Code of Conduct disciplinary hearing was held in Nashville. At the hearing, it was determined that five students violated the DECA Code of Conduct.

Upon the students' return to New York, a meeting was held on May 6, 2004. Superintendent Brown, Principal Ciulla, Assistant Superintendents Brandon and Bannich, Plaintiff, Roschelle (Plaintiff's Union representative), and James Skinner ("Dr. Skinner") all attended the meeting. (*See* Pl.'s Dep. at 212.) Superintendent Brown questioned Plaintiff

regarding the events that transpired during the DECA trip. Thereafter, Superintendent Brown met with the Board of Education during its executive session to discuss potential disciplinary actions to be taken against Plaintiff. Options discussed included the pursuit of disciplinary charges against Plaintiff or, alternatively, issuance of a letter-to-the-file. Superintendent Brown then met with Roschelle and Dr. Skinner regarding the potential disciplinary action contemplated by the District regarding Plaintiff's conduct during the DECA trip.

On May 20, 2004, Roschelle, as Plaintiff's Union representative, discussed with Plaintiff the possibility of the District offering her a letter-to-the-file instead of pursuing disciplinary charges pursuant. When asked by Roschelle if she would sign a letter instead of being charged, Plaintiff responded that it depended on the contents of the letter.

According to Roschelle, he discussed Plaintiff's situation with Conrad Lower, Esq., a Labor Relations Specialist employed by New York State United Teachers. Mr. Lower advised Roschelle that the District did have sufficient grounds to pursue disciplinary charges against Plaintiff based on her alleged conduct on the DECA trip. Mr. Lower further advised Roschelle that the letter-to-the-file would be a minimal penalty which was preferable to the potential of Plaintiff having to defend herself against formal disciplinary charges.

On Friday, May 21, 2004, Superintendent Brown provided Plaintiff with a copy of a letter to be placed in her file. The letter, which is written by Superintendent Brown and dated May 21, 2004, sets forth information allegedly provided by Plaintiff at the May 6, 2004 meeting about the DECA trip. After summarizing Plaintiff's alleged position at the meeting, Brown sets forth in detail the "many lapses of supervision and judgment" that occurred during the trip. (Defs.' Ex. N.) In conclusion, he directs that:

[Plaintiff's] role on overnight DECA trips be limited to ensuring that the students participate in the appropriate competitions. [Plaintiff] will no longer be responsible for chaperoning or supervising the students beyond that which is required to ensure their participation in these competitions. I am providing this letter to your file and the aforementioned consequence in response to this matter and offer you the opportunity to accept this in lieu of my proffering 3020-a charges"

(*Id.*)

At the end of the letter is a paragraph with a line below for Plaintiff's signature.

The paragraph provides as follows:

I have read and understand the above letter. I have also had the opportunity to consult with a representative of my employee organization and/or counsel. I understand that my agreement to the entry of the foregoing document on my file, as well as to the action proposed to be taken by the Superintendent of Schools, will constitute a waiver of my rights as a tenured employee pursuant to Education Law, Section 3020-a, including the right to receipt of notice of charges, a hearing on the record, the right to cross-examine witnesses, the right to call witnesses, the right to counsel, and the right to review of appeal as provided by statute.

I agree with the content and terms of the above letter and consent to it being placed in my personnel file.

(*Id.*)

After receipt of the letter, Plaintiff discussed its contents with both Roschelle and Dr. Skinner. She also consulted with two friends who were private attorneys. Roschelle advised Plaintiff that he had discussed the letter with the President of the Union and Mr. Lower and that both had agreed that it was wise for Plaintiff to sign the letter-to-the-file rather than become the subject of formal disciplinary charges under the Education Law. Roschelle explained that once the District accused her of misconduct under section 3020-a of the Education Law, the District could terminate her teaching position.

On Monday May 24, 2004, three days after having received the letter, Plaintiff signed it. Plaintiff made two handwritten changes to the letter, indicating that she was not a "judge" at the DECA Conference but rather served as a "proctor." Plaintiff's signature was witnessed by Roschelle as "Counsel or Union representative." After signing the letter, Plaintiff gave Roschelle and Dr. Skinner a bottle of wine to say "thank you" for their assistance. (Pl.'s Dep. at 335.) Nonetheless, Plaintiff now claims that she was coerced by Roschelle into signing the letter in that he told her that if she did not sign, she would lose her job. (*Id.* at 341-42.)

A nearly identical letter outlining the incident that occurred in Nashville on the DECA trip was presented to Klein, Plaintiff's supervisor, who accompanied Plaintiff on the trip Unlike Plaintiff, Klein did not sign her letter. Instead, after consulting with her union representative, she decided to request legal representation from the Society of Administrators of New York State. The letter-to-the-file presented to Klein was later revised and Klein was not required to sign the revised letter, which was placed in her personnel file along with her rebuttal.

Following the events regarding the May 2004 letter, Plaintiff was again offered a contract to continue as DECA Advisor for the 2004-2005 school year, which Plaintiff accepted. In fact, as of the date of her deposition, viz. February 3, 2006, Plaintiff was still the DECA Advisor. (*See* Pl.'s Dep. at 22.)

### C.    *Plaintiff's Termination as SP Coordinator*

On June 3, 2004, Principal Ciulla met with Plaintiff and notified her that her contract as SP Coordinator would not be renewed for the 2004-2005 school year.  Plaintiff's status as a tenured teacher and as DECA Advisor did not change.

According to Plaintiff, during the June 3, 2004 meeting, Principal Ciulla explained to Plaintiff that her decision was based on, inter alia, Plaintiff's failure to hold a homecoming meeting and her failure to hold town council meetings.  (Pl.'s Dep. at 45-51.)  Principal Ciulla also informed Plaintiff that "[she] wanted to dump [Plaintiff] last year and [Superintendent Brown] said back off, so [she] backed off last year."  (*Id.* at 49.)  Principal Ciulla testified that there were many reasons Plaintiff's contract was not renewed, including that Plaintiff was not competent at her job, she did not build up student participation, she did not hold monthly meetings which she had been asked to do, and she was not well-organized in working with teachers and getting things coordinated.  (Ciulla Dep. at 390.)[2]

On June 7, 2004, the SP Coordinator vacancy was advertised in each teacher's school mailbox and posted on the bulletin board in the school's main office.  Four teachers applied for the position.  Principal Ciulla, along with Associate Principal Geraldine DeCarlo, interviewed each applicant.  Three of the four applicants were under the age 40.  Ultimately, Julia Nappi, a teacher of social studies at Oceanside High School, who was thirty-eight years old at the time, was offered a contract for the 2004-2005 school year.

---

[2]  Prior to Plaintiff's June 3, 2004 meeting with Principal Ciulla, the Union was advised that Plaintiff's SP Coordinator contract would not be renewed.  However, Plaintiff agrees that Principal Ciulla alone made the decision not to renew Plaintiff's contract and that the Union had no control over the District's decision.

From June through September 2004, Plaintiff pursued a grievance through the Union regarding the non-renewal of her SP Coordinator contract. After proceeding through the first three steps, which were all denied, on October 10, 2004, the Union served its demand for initiation of the fourth and final stage, arbitration. According to Plaintiff, the arbitration has never been conducted.

**D.** *The Complaint*

On July 19, 2004, Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") This complaint included allegations of discrimination based upon age, lack of due process, retaliation, and disparate treatment. (*Id.*) On January 21, 2005, Plaintiff received her Right to Sue Notice and on March 24, 2005, the NYSDHR dismissed her claim. (*Id.* ¶ 9.)

Plaintiff filed the instant action on April 12, 2005. The Complaint asserts six causes of action, to wit: (1) a violation of the ADEA and the Fourteenth Amendment; (2) a violation of the First and Fourteenth Amendments pursuant to Section 1983 based on Plaintiff's alleged wrongful termination resulting from her speech on matters of "public concern"; (3) a violation of the Fourteenth Amendment pursuant to Section 1983 based on Plaintiff's allegedly wrongful termination from a position in which she allegedly had a property interest and related acts which ruined her reputation; (4) a violation of the First and Fourteenth Amendments pursuant to Section 1983 based on Defendants' acts of coercing Plaintiff to sign the May 21, 2004 letter; (5) a claim for punitive damages; and (6) a claim for attorney's fees under 42 U.S.C. § 1988. In addition, although not elaborated on in the body of the Complaint, and not later denominated as causes of action, in the beginning of her pleading Plaintiff lists claims

purportedly being asserted under state law, including breach of contract and defamation. (*Id.* ¶ 5.)

###### E. *The Court's March 30, 2006 Memorandum and Order*

Roschelle moved to dismiss the Complaint pursuant to Rule 12(b)(6). By Memorandum and Order dated March 30, 2006, Roschelle's motion was granted in part and denied in part. Specifically, the Court dismissed (1) Plaintiff's ADEA claims against Roschelle; (2) Plaintiff's claims under Section 1983 based on an alleged deprivation of property interests under the Fourteenth Amendment, finding that Plaintiff failed to allege a property interest in the SP Coordinator position; and (3) Plaintiff's claims for breach of contract and for defamation. The motion was denied as to Plaintiff's claims (1) under the NYSHRL; and (2) under Section 1983 based on First Amendment retaliation and Fourteenth Amendment deprivation of a protected liberty interest.

## DISCUSSION

### I. *Applicable Law and Legal Standards*

#### A. *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim.  *Id.* at 210-11.  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' "  *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).  Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).  "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation."  *Id.*  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo*, 22 F.3d at 1224.

## B.     *The McDonnell-Douglas Burden-Shifting Methodology*

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing

Title VII employment discrimination claims based on indirect or circumstantial evidence.  This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).  Claims brought pursuant to the ADEA are also analyzed under the McDonnell Douglas burden-shifting framework.  *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that race discrimination was an actual reason for the adverse employment action.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even  "minimal."  *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001).  It is a burden of production, not persuasion, and involves no credibility assessments.  *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle.  It is not a court's role to second-guess an

employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

## II.     *Plaintiff's Age Discrimination Claims*

### A.     *Plaintiff's Age Discrimination Claims Against Roschelle are Dismissed*

In its March 30, 2006 Memorandum and Order, the Court dismissed Plaintiff's ADEA claims against Roschelle, finding that the ADEA does not provide for individual liability. (*See* Mar. 30, 2006 Mem. and Order at 8.)  Plaintiff's age discrimination claims under the NYSDHR, however, were sustained.  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (NYSHRL imposes individual liability on a defendant who actually participates in the conduct giving rise to a discrimination claim), *abrogated on other grounds*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

Roschelle now moves for summary judgment on Plaintiff's age discrimination claims under the NYSDHR arguing, inter alia, that there is no evidence that Roschelle participated in the District's decision not to renew Plaintiff's SP Coordinator contract for the 2004-2005 school year.  Although Plaintiff filed papers in opposition to Roschelle's motion, Plaintiff wholly failed to address her age discrimination claims against Roschelle or Roschelle's arguments.

The Second Circuit, in the seminal case of *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004), addressed the proper analysis that districts courts should employ when presented with an unopposed motion for summary judgment.  The court held that "Fed. R. Civ. P. 56, governing summary judgment motions, does not embrace default judgment principles."  *Id.* at 242.  Thus, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."  *Id.*  In addition, "[a]lthough the failure to respond may allow the

district court to accept the movant's factual assertions as true, *see* Local Civ. R. 56.2," *id.* at 246, the district court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.* at 244.

Here, after reviewing the record, the Court finds that Plaintiff's age discrimination claims against Roschelle fail because there is absolutely no evidence from which a reasonable juror could infer that Roschelle participated in the District's decision not to renew Plaintiff's SP Coordinator contract for the 2004-2005 school year. The only evidence in the record connecting Roschelle with the District's decision is that the Union, as a courtesy, was notified that Plaintiff's SP Coordinator contract would not be renewed prior to Plaintiff receiving notification. This fact, standing alone, is insufficient to raise a genuine issue of fact as to Plaintiff's age discrimination claims against Roschelle. Accordingly, Plaintiff's NYSHRL claims against Roschelle are dismissed.

**B.** ***Plaintiff's Age Discrimination Claims Against the District Defendants are Dismissed***

Plaintiff claims that her position as SP Coordinator was not renewed for the 2004-2005 school year based on her age. She was 57 years old at the time. The Court analyzes Plaintiff's claim under the *McDonnell-Douglas* framework.[3]

To establish a prima facie case of discrimination, a plaintiff must show that: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and

---

[3] In addition to the *McDonnell Douglas* pretext analysis, Plaintiff makes a passing reference to the "mixed-motive" analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246-67 (2d Cir. 1989) (shifting burden of persuasion to defendant where there is direct evidence that illegal discrimination partly motivated an employment actions). Plaintiff's argument under *Price Waterhouse* fails because the record does not contain any evidence "directly *reflecting* the alleged discriminatory attitude." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir. 1997) (emphasis in original) (citations omitted).

(3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent.  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  For purposes of this motion, the District Defendants do not dispute that Plaintiff has established the first three elements of her prima facie case, viz. that she was a member of a protected class,[4] that she was qualified for the SP Coordinator position and that she suffered an adverse employment action.  Defendants do contend, however, that Plaintiff cannot prove that she was terminated under circumstances giving rise to an inference of discriminatory intent.

In its March 30, 2006 Memorandum and Order, the Court cited *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) for the proposition that the fourth prong of a prima facie case is satisfied if a plaintiff demonstrates that her position was ultimately filled by person not member of protected class.  (*See* Mar. 30, 2006 Mem. and Order at 10); s*ee also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) ("[T]he fact that [plaintiff] was replaced by a 31-year-old is sufficient to give rise to the inference that [plaintiff] was the victim of discrimination.").  Here, the SP Coordinator position went to Julia Nappi, a teacher of social studies at Oceanside High School, who was thirty-eight years old at the time.  Accordingly, the Court finds that Plaintiff has established a prima facie case of age discrimination.

Once a plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  As noted previously, an employer's burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous.

---

[4]  This protection extends to employees who are at least 40 years old.  *See* 29 U.S.C. § 631(a).

Here, the District Defendants maintain that they did not offer Plaintiff a new contract for the 2004-2005 school year because Principal Ciulla was unhappy with Plaintiff's performance as SP Coordinator, specifically Plaintiff's inability to sufficiently address the interests of the student body as a whole. This claim, which is well supported by the record, clearly satisfies Defendant's burden. *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that more likely than not discrimination motivated the adverse employment action. The only "evidence" Plaintiff proffers is Principal Ciulla's deposition testimony:

> Q. Of the [co-curricular] positions that you didn't renew, how many of those teachers were under 40, if you know?
> A. From what I can remember, I don't think any of them were under 40.
> Q. How many of them were over 40?
> A. I think they were all over 40.

(Ciulla Dep. at 397.) Principal Ciulla also testified that she did not know how many co-curricular positions there were at Oceanside High School during the 2004-2005 school year but that as of the date of the deposition (March 2006), there were approximately 40 to 50 such positions. (*Id.*)

Principal Ciulla's testimony standing alone is insufficient to defeat summary judgment. All one may glean from her testimony is that all of the teachers whose co-curricular positions she did not renew were over forty. We do not know, however, how many co-curricular

positions there were, how many co-curricular positions were not renewed, or whether or not the teachers not renewed were replaced with younger workers. In the absence of such information, Plaintiff's so-called evidence is insufficient to create a triable issue of fact.[5]

After reviewing the record, the Court finds that there is no additional evidence demonstrating that the District Defendants were motivated by age animus. In fact, the record strongly suggests that invidious discrimination was unlikely. Plaintiff was within the protected class (forty-seven years old) when she was first hired for the SP Coordinator position for the 1994 to 1995 school year. She was offered a new contract each and every year through the 2003 -2004 school year, when she was fifty-six years old. It would be difficult for a reasonable juror to conclude that the District Defendants failed to renew Plaintiff's contract for the 2004-2005 school year because of her age, viz. fifty-seven, when she was offered contracts for each succeeding year from the time she was forty-seven through and including fifty-six. *Cf. Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("Case law teaches that where the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision.").

In addition, although Plaintiff was not offered the SP Coordinator position for the 2004-2005 school year, Plaintiff remained a tenured teacher of business marketing classes at Oceanside High School and remained in the non-tenured position as DECA Advisor. As such, Plaintiff has failed to delineate any plausible explanation why the District Defendants would

---

[5] The District Defendants proffer their own statistics in the form of charts listing the names of club advisors at Oceanside High Schools and their ages (Defs.' Ex. J), as well as a list of which contracts were not renewed. (*Id.* Ex. K.) Because it appears that the statistics are not limited to the specific school and time period at issue in this case, the Court does not find them relevant for present purposes.

discriminate against her on the basis of her age with regard to the SP Coordinator position only.

Finally, following the decision not to renew Plaintiff's contract, each and every teacher at Oceanside High School was given the opportunity to apply for the vacant position. Of the four teachers who applied, three were under the age of forty and thus outside the protected class. Julia Nappi, who was thirty-eight years old at the time, was ultimately offered a contract for the 2004-2005 school year. The fact that there was only one person (out of four) in the protected class for the District Defendants to choose from in hiring a replacement for Plaintiff undercuts Plaintiff's argument that in hiring Ms. Nappi, the District Defendants acted with discriminatory animus.

In conclusion, other than the fact that Plaintiff was replaced by a younger worker, Plaintiff offers no other evidence which would bolster her prima facie case or demonstrates pretext. The lone fact that the AP Coordinator position went to Ms. Nappi, a thirty-eight year old, is insufficient to defeat summary judgment. *Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 134 (2d Cir. 1999) ("The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination."). Thus, the Court finds that a reasonable juror could not conclude that the District Defendants did not renew Plaintiff's position based on her age. Accordingly, the District Defendants' motion for summary judgment on Plaintiff's age discrimination claims is granted.[6]

---

[6] Discrimination claims under the NYSHRL are subject to the same analysis as claims brought pursuant to the ADEA. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Accordingly, the above analysis applies to Plaintiff's claims under both statutes.

### III.    *Plaintiff's Section 1983 Claims are Dismissed*

#### A.    *First Amendment Retaliation*

Plaintiff alleges that she was removed as SP Coordinator "as a direct result of reporting the illegal conduct of Defendant District and its officials, as her removal as Coordinator would eliminate her interaction and oversight of the school district's finances for high school student extracurricular activities." (Compl. ¶ 51.)

A public employee making a First Amendment retaliation claim under Section 1983 must initially demonstrate by a preponderance of the evidence: (1) that her speech addressed a matter of public concern, (2) that she suffered an adverse employment action, and (3) that a causal connection existed between the speech and the adverse employment action, in that the speech was a motivating factor for the action. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003); *see also Cioffi v. Averill Park Cent. School Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). If a plaintiff establishes these three factors, the burden shifts to the defendant to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the employee's protected speech. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). Alternatively, a defendant may avoid liability be demonstrating that "plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." *Mandell*, 316 F.3d at 382-82 (citation and internal quotation marks omitted).

#### 1.    **Plaintiff's Speech did not Address a Matter of Public Concern**

The question of whether an employee's speech addresses a matter of public concern is one of law, not fact. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983); *see also*

*Morris*, 196 F.3d at 110.  "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Connick*, 461 U.S. at 146).  "If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee."  *Id.* (quoting *Connick*, 461 U.S. at 146).   As explained by the Supreme Court:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149.  Thus, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 1960 (2006).

Here, Plaintiff claims that she was retaliated against for voicing complaints that her own secretary, Ms. Dunwoody, was forging her name on student projects purchase orders. More specifically, in her role as SP Coordinator, Plaintiff was responsible for signing off on the purchase of supplies for extra-curricular student activities once the proper supporting documentation was provided.  In September 2001, Plaintiff discovered that her signature had been forged on numerous purchase orders.  Plaintiff reported the forgeries to several school administrators, including her immediate supervisor, the Assistant Principal, and the then

Principal.  An investigation into the matter led to Betty Dunwoody, the Special Projects

Secretary, who admitted that she had signed Plaintiff's name on the forms.  In June 2002, when

the matter had still not been resolved, Plaintiff reported the forgeries to Superintendent Brown.

In April 2003, Plaintiff discovered the final forgery and reported it to Principal Ciulla.  Other

than school administrators, Plaintiff did not report the forgeries to any outside agency.  Plaintiff

did not accuse Ms. Dunwoody of making improper purchases or mishandling funds.

The Court finds that Plaintiff was not acting as a citizen when she brought the

forgeries to her superiors' attention.  Rather, she was acting pursuant to her official duties as SP

Coordinator, viz. approving and signing off on purchase orders.  Once she discovered her name

had been forged, it became clear that she had not approved those purchase orders and she had a

duty to advise her supervisors.  *See Garcetti*, 126 S. Ct. at 1960.

In sum, the Court finds that there is no evidence in the record to back up

Plaintiff's allegations that she uncovered a web of financial improprieties that related to matters

of public concern.  Accordingly, Plaintiff's speech is not entitled to constitutional protection.[7]


### 2. Plaintiff Has Failed to Establish a Causal Connection

Even assuming Plaintiff could establish that her speech was protected by the

First Amendment, her claim would still fail because there is no evidence which even suggests

---

[7]  The only other so-called financial impropriety in the record is that in May 2003, while
Plaintiff was present, over $50,000 in cash was found in the Student Projects safe in violation of
District policy that such funds be deposited within twenty-four hours of receipt.  Plaintiff
testified that Ms. Dunwoody was the only person who could have placed the money in the safe.
However, Plaintiff admits that she never accused Ms. Dunwoody of stealing funds and there is
no evidence that any funds were missing.  Moreover, upon discovery, the funds were
immediately deposited.

that a causal connection existed between her speech and the adverse employment action, viz. her loss of the SP Coordinator position for the 2004-2005 school year.[8] To establish causation, Plaintiff must show that the protected speech "was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110 (citations omitted); *see also Cioffi*, 444 F.3d at 167. A plaintiff may establish causation indirectly by means of circumstantial evidence, such as by "showing his speech was closely followed in time by the adverse employment decision," *Cioffi,* 444 F.3d at 168, or "directly by evidence of retaliatory animus," *Morris*, 196 F.3d at 110.

Here, there is no direct evidence that Plaintiff was not offered the position of SP Coordinator for the 2004-2005 school year based upon her complaints regarding the forgeries. Instead, Plaintiff attempts to establish causation circumstantially by relying on the alleged proximity between her complaints and Principal Ciulla's employment decision.

It is undisputed that Plaintiff's complaints of forgeries began in September 2001 and ended in April 2003; additionally, she witnessed the cash in the safe in May 2003. Significantly, despite Plaintiff's initial reporting in September 2001, the District continued Plaintiff in the SP Coordinator position during the 2001-2002, 2002-2003 and 2003-2004 school years. Principal Ciulla decided not to renew Plaintiff's SP Coordinator contract for the 2004-2005 school year in June 2004. Therefore, at the time of Principal Ciulla's decision (June 2004), over one year had passed since Plaintiff had made any complaints (May 2003).

---

[8] Defendants do not dispute that Plaintiff suffered an adverse employment action.

In the Second Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (stating that twelve days between alleged sexual harassment and discharge could suggest a causal relationship). Though there is no bright-line rule, an adverse employment action following within a couple months of the protected activity typically suffices to establish causal connection. *See Cioffi*, 444 F.3d at 168 ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.") (collecting cases); *Gormon-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month period between filing of EEOC complaint and retaliating action sufficient to suggest causal relationship). Here, the passage of over one year between the time of Plaintiff's last complaint and her June 2004 non-renewal is too long to raise a question of fact on causation. *See Chang v. Safe Horizons*, No. 05-6760-CV, 2007 WL 3254414 (2d Cir. Nov. 5, 2007), at *1 (summary order) (affirming lower court's grant of summary judgment in defendant's favor where plaintiff's termination "occurred almost one year after her complaint of discrimination, thus undermining any causal nexus based on temporal proximity); *Butler v. Raytel Med. Corp.*, 150 Fed. Appx. 44, 2005 WL 2365340, at *2 (2d Cir. Sept. 27, 2005) (summary order) (finding one year to be too long to raise issue of fact on temporal proximity); *Ludwiczak v. Hitachi Cap. Am. Corp.*, – F. Supp. 2d. –, No. 3:05CV00239,

2007 WL 4554046, at *9 (D. Conn. Dec. 27, 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship.").

To counter the lack of temporal proximity, Plaintiff argues that Principal Ciulla and Superintendent Brown reached an agreement to terminate Plaintiff as SP Coordinator at the end of the 2002-2003 school year, contemporaneously with her 2003 complaints regarding the forgeries, but that they waited a year to implement their decision to afford them time "to lay the pretextual background to justify Plaintiff's termination." (Pl.'s Mem. in Opp'n to Roschelle's Mot. at 13.) Plaintiff contends that Brown and Ciulla could not have acted on their impulse in 2003 because Plaintiff was awarded the Oceanside Parent-Teacher's Association PTA-Honorary Life Award" in June 2003. Because this is "the highest honor the PTA can award an individual," "a jury could infer that the adverse decision made by Brown and Ciulla could not be justified to the public, so it was put on hold for a year." (*Id.*)

In support of this alleged 2003 agreement between Ciulla and Brown, Plaintiff relies on both her deposition testimony and that of Superintendent Brown. Superintendent Brown testified that Principal Ciulla became principal of Oceanside High School in February 2003. At the end of the 2002-2003 school year, Principal Ciulla told Superintendent Brown that she felt that Plaintiff should be replaced as SP Coordinator. (Brown Dep. at 142.) Brown testified that he responded to Ciulla as follows:

> [Y]ou just completed one year, [Plaintiff's] been here a long time, I think you ought to make sure you sit down with her and tell her all of the things that you perceive as how she could be successful with this job and certainly give it another year. So she did . . . .

(*Id.* at 142-43.)

Plaintiff testified that in 2004, Principal Ciulla told Plaintiff that "[she] wanted to dump [Plaintiff] last year and [Superintendent Brown] said back off, so [she] backed off last year." (Pl.'s Dep. at 49.)

Plaintiff's assertion that the above testimony suggests that Ciulla and Brown reached an agreement to terminate Plaintiff from the SP Coordinator position in 2003 but waited to formally implement their decision until 2004 so as not to arouse suspicion regarding their intention is wholly unsupported by the facts. At best, the testimony reflects that Principal Ciulla did not want to renew Plaintiff's contract at the end of the 2003 school year but after discussing the matter with Superintendent Brown, ultimately decided to offer Plaintiff a new contract.[9] Thus, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to causation.

### 3. *Conclusion as to First Amendment Retaliation Claim*

Because Plaintiff has failed to establish that her speech addressed a matter of public concern and because Plaintiff has failed to raise a genuine issue of material fact as to whether a causal connection existed between her speech and the non-renewal of the SP Coordinator position, Defendants' motion for summary judgment is granted with respect to Plaintiff's First Amendment retaliation claim.[10]

---

[9] It is undisputed that Principal Ciulla alone was responsible for the hiring decision.

[10] Although the Court has dismissed Plaintiff's First Amendment retaliation claim against all Defendants, the Court notes that with regard to defendant Roschelle, an additional reason why Plaintiff's claim must fail is because there are no allegations whatsoever linking Roschelle to the facts upon which Plaintiff's First Amendment retaliation claim is based. For example, Plaintiff never reported the alleged financial improprieties to Roschelle or the Union, Roschelle had no control over Principal Ciulla's decision not to renew Plaintiff's contract, and the record is devoid of even an inference that Roschelle was ever aware of Plaintiff's complaints.

**B.      Fourteenth Amendment Due Process**

Plaintiff alleges that she was deprived of due process under the Fourteenth Amendment in relation to her loss of the SP Coordinator position.  For the reasons stated below, Plaintiff's claims under the Fourteenth Amendment are dismissed.

The Due Process Clause imposes procedural safeguards on governmental decisions that deprive individuals of liberty or property interests, within the meaning of the Fifth or Fourteenth Amendments.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), *limitation of holding on other grounds recognized by*, *Hines v. Miller*, 318 F.3d 157 (2d Cir. 2003).  Thus, to prevail on a procedural due process claim under the Fifth and Fourteenth Amendments, a plaintiff must necessarily demonstrate that he was deprived of a protected property or liberty interest.  *See Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995).

**1.      Property Interest**

By Memorandum and Order dated March 30, 2006, the Court found that Plaintiff failed to allege a property interest in the SP Coordinator position and therefore granted Roschelle's motion to dismiss Plaintiff's claims under the Fourteenth Amendment to the extent they were based on an alleged deprivation of *property* interests.  In so holding, the Court found that "Plaintiff ha[d] failed to allege that she was deprived of a protected property interest as she ha[d] not alleged that she had *any* right to the SP Coordinator position beyond her own subjective expectation."  (Mar. 30, 2006 Mem. and Order at 16.)  The Court declined to dismiss Plaintiff's Fourteenth Amendment claims to the extent they were based on a deprivation of a protected *liberty* interest.

Despite the Court's ruling, Plaintiff once again argues that she had a protected property interest in the SP Coordinator position based upon "evidence accumulated since the Court's

decision." (Pl.'s Mem. in Opp'n to District Defs.' Mot. at 15.) Plaintiff states that "[t]he parties agree that tenured teachers do have protected property rights and that protected property rights do not apply to co-curricular or extracurricular positions." (Pl.'s Mem. in Opp'n to District Defs.' Mot. at 15.) Nonetheless, Plaintiff claims that there is an exception to this rule where, as here, a teacher holding the position of SP Coordinator is relieved of four teaching periods per day and paid a full teacher's salary. (*Id.*) Because "the parameters of this position were established by Oceanside," Plaintiff argues that "a protected property interest attaches to it." (*Id.* at 16.)

Putting aside the fact that Plaintiff never moved for reargument and even now, cites no legal authority for her position, Plaintiff's "accumulated" evidence reflects nothing more than a job description of the SP Coordinator position and mirrors what was alleged in her Complaint. The Court has already rejected this argument and these claims have already been dismissed. The Court therefore proceeds to a discussion of Plaintiff's claims regarding deprivation of a liberty interest.

## 2. Liberty Interest

Plaintiff alleges that she was terminated from the SP Coordinator position shortly after she was forced to sign a letter containing allegedly false charges which cited her many "lapses of supervision and judgment" regarding the DECA trip. The letter, dated May 21, 2004, was subsequently placed in her personnel file. Plaintiff alleges that the stigma she suffered as a result of the letter, combined with the tangible loss occasioned by her removal from the SP Coordinator position, amounted to a constitutionally cognizable deprivation of liberty without sufficient process. She also claims a tangible loss emanating from the placement of the letter in her personnel file, which she claims may impede her chances of gaining future employment elsewhere. (*See* Compl.

¶ 83 (alleging that Plaintiff's "good name, professional standing and reputation, honor and integrity have been denigrated and destroyed, and her ability to pursue her chosen profession has been put at risk by Defendants' actions").)

Loss of one's reputation can invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d. Cir. 2004). This is the type of claim that is commonly referred to as a "stigma-plus" claim. *See Morris*, 196 F.3d at 114 ("Due process is only implicated when there is 'stigma plus,' that is to say a loss of reputation 'coupled' with some other tangible element,' such as termination.") (quoting *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994)); *see also Donato v. Plainview-Old Bethpage Cent. School Dist.*, 96 F.3d 623, 630 (2d Cir. 1996) ("[W]hen the state fires an employee and publicly charges that she acted dishonestly or immorally, due process guarantees the employee an opportunity to defend her good name, reputation, honor or integrity.") (citations and internal quotation marks omitted).

The Second Circuit set forth the standard for a "stigma-plus" claim as follows:

> In order to fulfill the requirements of a stigma-plus claim arising from the termination from government employment, a plaintiff must first show that the government made stigmatizing statements about her–statements that call into question plaintiff's "good name, reputation, honor, or integrity." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980). Statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" may also fulfill this requirement. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996). A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false. *See Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir.1987). Second, a plaintiff must prove these stigmatizing statements were made public.

> See Abramson, 278 F.3d at 101-02 . And third, plaintiff must show the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment. *See Martz v. Incorporated Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (five months later for publication of defamatory statements is too long). If a plaintiff successfully proves his stigma-plus claim, due process requires that as a remedy he be given a post-deprivation opportunity to clear his name. *Roth,* 408 U.S. at 573 & n. 12, 92 S. Ct. 2701; *Donato,* 96 F.3d at 633.

*Patterson*, 370 F.3d at 330 (footnote omitted).

### a.    *Nexus Requirement*

Defendants argue that Plaintiff's "stigma-plus" claim fails because her removal from the SP Coordinator position was wholly separate from the alleged stigmatizing statements pertaining to her role as DECA Advisor, a position which from Plaintiff was not terminated. Defendants contend that Plaintiff has failed to allege, much less prove, "any logical, cogent nexus between Principal Ciulla's decision not to rehire her as SP[ Coordinator], and Superintendent Brown's letter of reprimand relating to DECA." (District Defs.' Reply at 9.) Plaintiff counters that "[a]n argument that the letter was part of an overall course of action to discredit Plaintiff has been set forth herein." (Pl.'s Mem. in Opp'n to Roschelle's Mot. at 18.) In this regard, she contends that:

> a jury [could] infer that Defendants Brown and Ciulla, after deciding to terminate Plaintiff at the end of the 2002-2003 school year, utilized the 2003-2004 school year to establish false reasons to justify this decision. The disparate treatment suffered by Plaintiff, the harassment and the subsequent 'counseling letter' following the May 2004 trip to Nashville, were parts of the overall efforts of Defendants to ruin Plaintiff's professional reputation. Viewed in this context, a jury could infer that this letter was another step in the overall plan created by Defendants to terminate Plaintiff from the [SP] Coordinator position, and to force her to retire her tenured position as a teacher at Oceanside."

(*Id.*) Neither Plaintiff nor Defendants cite any authority that is directly on-point.

-33-

"In a typical 'stigma-plus' case, the stigmatizing statement originates from the same state actor who imposes the 'plus,' such as when a government employer defames an employee in the course of terminating that employee." *Velez v. Levy*, 401 F.3d 75, 88 (2d Cir. 2005). Here, however, the "stigma" emanated from Superintendent Brown, who placed an allegedly stigmatizing letter in Plaintiff's personnel file regarding the DECA trip. The "plus" was imposed by Principal Ciulla who made the decision not to renew Plaintiff's contract for SP Coordinator. Moreover, the "stigma" and the "plus" relate to different positions, namely, the DECA Advisor position which Plaintiff still holds (the "stigma") and the SP Coordinator position which Plaintiff lost (the "plus").

In *Velez*, the Second Circuit was confronted with similar though not identical facts. In that case, the plaintiff alleged that the board member defendants, by levying false charges against her, created a public "stigma." *Id.* at 88. The board members, however, did not directly impose the "plus," namely, plaintiff's removal from the school board, which only the defendant Chancellor had the authority to do. *Id.* The Second Circuit held that "perfect parity in the origin of both the 'stigma' and the 'plus' is not required to state the infringement of a 'stigma-plus' liberty interest." *Id.* at 89. Instead, it is sufficient if the "stigma" and the "plus" are claimed to be sufficiently proximate. *Id.*

> This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected-for example, due to their order of occurrence, or their origin, and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so. There is no rigid requirement, therefore, that both the "stigma" and the "plus" must issue from the same government actor or at the same time.

*Id.* (citations omitted).

In *Velez*, although the "stigma" and the "plus" emanated from different sources, they both related to the same position, i.e., the plaintiff's position as a board member. Here, on the other hand, both the sources (Superintendent Brown and Principal Ciulla) and the positions (DECA Advisor and SP Coordinator, respectively) differ. Even assuming that *Velez* applied to the facts of this case, Plaintiff's claim would still fail. The first *Velez* requirement – that the "stigma" and the "plus" appear connected – is satisfied given the close temporal proximity between the May 21, 2004 DECA letter and the June 3, 2004 notice that Plaintiff's contract as the SP Coordinator would not be renewed for the 2004-2005 school year. There is no evidence in the record, however, supporting a reasonable inference on the second requirement, viz. that Principal Ciulla adopted, either explicitly or implicitly, Superintendent Brown's statements regarding Plaintiff's lapses in judgment regarding the DECA trip in deciding not to renew Plaintiff's contract as SP Coordinator. In fact, Plaintiff's Complaint does not even allege a connection between the May 2004 DECA letter and the fact that Plaintiff was not thereafter rehired as SP Coordinator. Instead, the Complaint alleges solely that Plaintiff was not rehired as SP Coordinator due to her age or, alternatively, in retaliation for her complaints of financial improprieties, discussed *supra*. Putting aside any technical defects in Plaintiff's pleading, the record is bereft of any evidence that the two events were in any way connected. Although Plaintiff argues in her memoranda that the May 2004 letter was part of an overall course of action to discredit Plaintiff, Plaintiff points to no facts in the record which support her argument. In this regard, it is significant that after receiving the May 2004 letter, Plaintiff was still offered a new DECA Advisor contract for the 2004-2005 school year, as well as for the years 2005-2006. In addition, her position as a tenured teacher has continued. Accordingly, the Court finds that Plaintiff's "stigma-plus" claim must fail as she has failed to raise a genuine issue of

material fact that there was any nexus between the alleged "stigma" and the alleged "plus." *Compare Velez*, 401 F.3d at 90 (finding that plaintiff had adequately pled the second nexus requirement where the Chancellor's decision to exclude plaintiff from office was *expressly* based on the disparaging statements made by the other board members).

### b.    *Public Requirement*

Even assuming that Plaintiff had established a nexus between the "stigma" and the "plus," her claim would still fail as there is no evidence in the record that the allegedly stigmatizing statements were made public.  In the Court's March 30, 2006 Memorandum and Order, the Court noted that a "stigmatizing false statement can satisfy the publication requirement if it is placed in an employee's personnel file where it is likely to be disclosed to future employers."  (Mar. 30, 2006 Mem. and Order at 18 (citing *Brandt*, 820 F.2d at 45 ("If [plaintiff] is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities.").)  "The purpose of the requirement is to limit a constitutional claim to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities." *Brandt*, 820 F.2d at 44.  Thus, the issue here is whether there is a question of fact as to whether the letter placed in Plaintiff's personnel file is likely to be disclosed to prospective employers.

In support of their argument that the letter is not "public," Defendants proffer the affidavit of Superintendent Brown, wherein he states that the letter is kept at the Personnel Office in the Administrative Building for Oceanside School District.  He further states that "prospective

employers or other third parties <u>cannot</u> access [Plaintiff's] personnel file containing the counseling letter." (Brown Aff., dated Apr. 12, 2007, ¶ 22.)

In response, Plaintiff makes two arguments. First, she argues that Defendants' allegations as to access to Plaintiff's personnel file are contradicted by the deposition testimony of Principal Ciulla. (*See* Pl.'s Rule 56.1 Stmt. in Opp'n to District Defs.' Mot. ¶ 36 (citing Ciulla Dep. at 44-47).) Specifically, Plaintiff asserts that Principal Ciulla testified that "[l]etters in a teacher's personnel files may be reviewed when a teacher is being considered for hiring or re-hiring." (*Id.* ¶ 35.) Plaintiff misconstrues the record. Principal Ciulla was asked whether while interviewing individuals for Oceanside High School she "had an opportunity to review any personnel file with regard to any hires." (Ciulla Dep. at 44.) Although initially she responded "[y]es" (*id.*), she later distinguished between personnel files, which are official files kept in the District Office, and files she keeps in her own office at the school, containing observations and evaluations regarding the employee. (*Id.* at 48-50.) She then clarified that she never saw Plaintiff's personnel file (*id.* at 48), nor did she ever see any of the personnel files for any of the four applicants for the SP Coordinator position for the 2004-2005 school year. (*Id.* at 50.) Contrary to Plaintiff's allegations, Principal Ciulla never testified that third parties have access to personnel files. Thus, Principal Ciulla's deposition testimony does not raise an inference that Plaintiff's personnel file is likely to be disclosed to prospective employers.

Next, Plaintiff contends:

[Defendants'] argument [that the letter is unlikely to be disclosed to future employers] fails to take into consideration any requests from prospective employers or other individuals concerning Plaintiff's abilities as a teacher. Brown and Ciulla would have to remain silent if asked by a prospective employer whether Plaintiff had ever been negatively evaluated in the conduct of her responsibilities. As

> responsible administrators, the assumption would be that Defendants would answer any inquiry truthfully. If that assumption is correct, then disclosure of the existence of the letter is conceded and the statements concerning Plaintiff's abilities and judgment would become public knowledge.

(Pl.'s Mem. in Opp'n to Roschelle's Mot. at 18.) Plaintiff's claim is nothing more than speculation and conjecture, which is insufficient to defeat summary judgment. *See, e.g.*, *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). In light of Superintendent Brown's unrefuted testimony that teachers' personnel files are not publically accessible and that the contents of those files are not released to prospective employers, together with the fact that even after receiving the letter, Plaintiff retained her position as DECA Advisor and continued her employment as a tenured teacher within the District, Plaintiff has failed to raise a genuine issue if fact that the charges contained in the may 2004 letter "are likely to be disseminated widely enough to damage [Plaintiff's] standing in the community or foreclose future job opportunities." *Brandt*, 820 F.2d at 44. Accordingly, Plaintiff fails to satisfy the public disclosure requirement of a "stigma-plus" claim.

There being no issue of fact as to whether Plaintiff was deprived of a liberty interest, Defendants' motion for summary judgment with regard to Plaintiff's Fourteenth Amendment claim is granted.

## CONCLUSION

For all of the above reasons, Defendants' motion for summary judgment is

GRANTED.  Upon entry of judgment, the Clerk shall close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       January 31, 2008                          _____/s/_____

                                                 Denis R. Hurley
                                                 Unites States District Judge